**[Cite as *Williams v. Toy*, 2023-Ohio-1844.]**

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| DEBBIE WILLIAMS | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellant | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Andrew J. King, J. |
| -vs- | : | |
| | : | |
| HEATH TOY, ET AL. | : | Case No. 2022 CA 00055 |
| | : | |
| Defendants-Appellees | : | O P I N I O N |


CHARACTER OF PROCEEDING:            Appeal from the Court of Common
                                    Pleas, Case No. 21 CV 00495


JUDGMENT:                           Reversed and Remanded


DATE OF JUDGMENT:                   June 1, 2023


APPEARANCES:

For Plaintiff-Appellant             For Defendants-Appellees

C. JOSEPH MCCOY                     DONALD G. DRINKO
65 East State Street                LIZ R. PHILLIPS
Suite 1300                          1215 Superior Avenue
Columbus, OH  43215                 7th Floor
                                    Cleveland, OH  44114

*King, J.*

{¶1}    Plaintiff-Appellant, Debbie Williams, appeals the June 14, 2022 judgment entry of the Court of Common Pleas of Licking County, Ohio, granting summary judgment to Defendants-Appellees, Heath Toy and Erica Elson, on her claim for negligent infliction of emotional distress.  We reverse the trial court.

FACTS AND PROCEDURAL HISTORY

{¶2}    On April 24, 2019, Williams was walking her two dogs in the neighborhood in which she resides.  As she and her dogs passed the residence owned by Toy, his pit bull mix dog jumped the fence and attacked Williams's dogs, killing one.  Elson was Toy's girlfriend at the time and was caring for Toy's dog while he was out-of-town.

{¶3}    On October 1, 2019, Williams filed a complaint alleging negligence, strict liability, negligent infliction of emotional distress, and loss of consortium.  On April 26, 2021, Williams voluntarily dismissed her complaint without prejudice pursuant to Civ.R. 41(A)(1)(a).

{¶4}    On June 7, 2021, Williams refiled her complaint, alleging strict liability, negligent infliction of emotional distress, and loss of consortium.

{¶5}    On January 3, 2022, appellees filed a motion for partial summary judgment on Williams's claims for negligent infliction of emotional distress and loss of consortium. Appellees argued Ohio law does not provide for the recovery of damages for emotional distress arising from witnessing damage to one's personal property and that, because under Ohio law dogs are considered personal property, Williams's claim for emotional distress must fail.  In addition, appellees argued Ohio law does not provide for recovery for loss of consortium of a pet.

{¶6} On March 18, 2022, Williams filed a brief in opposition, arguing she suffered emotional distress not only from witnessing the attack on her dogs, but also from her fear for her own personal safety during the attack.

{¶7} By judgment entry filed June 14, 2022, the trial court granted appellees' motion for partial summary judgment, finding Williams was unable to sufficiently demonstrate via expert testimony that the emotional distress of which she complained was due to her fear for her own physical safety and therefore compensable under Ohio law. The trial court also found Williams's loss of consortium claim for the loss of her dog was not recognized in Ohio. Williams's strict liability claim proceeded to a jury trial and judgment was rendered in favor of Williams in the amount of $2,000.00.

{¶8} Williams filed an appeal with the following assignment of error:

I

{¶9} "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AND DISMISSING THE NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS [NIED] CLAIM OF PLAINTIFF, DEBBIE WILLIAMS, AGAINST DEFENDANTS HEATH TOY AND ERICA ELSON, WHEN GENUINE ISSUES OF MATERIAL FACT EXIST ON EVERY ELEMENT OF PLAINTIFF'S NIED CLAIM."

I

{¶10} In her sole assignment of error, Williams claims the trial court erred in granting summary judgment to appellees on her claim for negligent infliction of emotional distress. We agree.

{¶11} Summary judgment motions are to be resolved in light of the dictates of Civ.R. 56. Regarding summary judgment, the Supreme Court stated the following in *State ex rel. Zimmerman v. Tompkins,* 75 Ohio St.3d 447, 448, 663 N.E.2d 639 (1996):

Civ.R. 56(C) provides that before summary judgment may be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex. rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379, citing *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

{¶12} As an appellate court reviewing summary judgment motions, we must stand in place of the trial court and review summary judgments on the same standard and evidence as the trial court. *Smiddy v. The Wedding Party, Inc.,* 30 Ohio St.3d 35, 506 N.E.2d 212 (1987).

{¶13} As explained by this court in *Leech v. Schumaker,* 5th Dist. Richland No. 15CA56, 2015-Ohio-4444, ¶ 13:

It is well established the party seeking summary judgment bears the burden of demonstrating that no issues of material fact exist for trial. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment is delineated in *Dresher v. Burt* (1996), 75 Ohio St.3d 280 at 293: " * * * a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." The record on summary judgment must be viewed in the light most favorable to the opposing party. *Williams v. First United Church of Christ* (1974), 37 Ohio St.2d 150.

{¶14} By judgment entry filed June 14, 2022, the trial court granted appellees' motion for partial summary judgment, finding Williams did not present expert testimony to establish the harm of which she complains resulted from appellees' conduct. While we agree with much of the trial court's analysis, we do not agree that testimony from a medical expert was legally required in this case. Further, the testimony before the trial court regarding Williams's fear and severe emotional distress was sufficient to create a genuine issue of material fact. Thus, the matter should have gone to a jury. We reverse for the reasons that follow.

{¶15} In support of her position, Williams relied on her own deposition testimony, the deposition testimony of her personal physician, Dr. Charles Geiger, and the affidavit of friend, Tammie Straight.

{¶16} Williams testified on April 24, 2019, she took her dogs Amigo and Pudge for a walk. Williams depo. at 19. Williams was five foot one, and at the time of the incident, was approximately sixty-four years old. *Id.* at 14, 35. As she was walking past Toy's residence, she watched Elson open the door and saw a dog "flying out." *Id.* at 49. Williams had walked past the residence when she saw Elson beside the dog; she also observed that the dog was jumping, trying to get over the fence. *Id.* at 49-50. Williams saw the dog clear the fence, and her testimony then was that the dog "came foaming at the mouth, snarling, red eyed, coming [towards her]." *Id.* at 50, 52.

{¶17} At that point in time, Williams testified, "I thought we were all dead." *Id.* at 50. Williams held on to each of her dogs' leashes and was "screaming at the top of my lungs." *Id.* at 58. The dog reached them and then clamped down on Pudge's head and

neck several times. *Id.* The attacking dog shook Pudge "in a frenzy, an absolute frenzy"; Williams never stopped screaming. *Id.* at 59. The dog released Pudge, and shortly after began its next attack. *Id.* at 60. Williams was not sure if the dog was coming at her or Amigo because "there was no white in her eyes, it was just like red in her eyes and she just - - she looked at me and she looked at him as if she was deciding which way to go, and she nailed him." *Id.* Ultimately the dog attacked Amigo—not her. The dog shook and shook Amigo and then released him. T. at 61. Neighbors came out and fought off the dog and helped Williams escape with her two dogs. *Id.* at 62-63.

{¶18} Following the attack on Pudge, Elson came to retrieve her dog; Elson returned the dog to Toy's backyard; but in short order the dog jumped the fence again and attacked Amigo again. *Id.* at 64-67. While Elson was attempting to bring her dog under control, she was bitten. *Id.* at 65-66. There is dispute among the parties which dog bit her. While Elson maintains one of Williams's dogs bit her, Williams testified it was "impossible" for either of her dogs to have bitten Elson because her dogs "never made a sound, never did anything." *Id.* at 65; Elson depo. at 10.

{¶19} Williams testified to the serious psychological injuries she received from the incident and the medications she was on. *Id.* at 90-91. Williams testified, "I couldn't even go out of my house. I was too frightened there might be something out there, a big dog running loose to attack me. I am very lucky that I am alive right now. That dog looked at me when he had Amigo in his mouth. He looked at me as if he was going to put Amigo down and come for me." *Id.* at 96. Williams was not physically injured during the incident, but "[m]ost definitely" perceived she was going to be attacked. *Id*. at 96-97. Williams testified her emotional distress claim was related to seeing Amigo "murdered" "[a]nd being

terrified that I'm going to die too.  I thought we all three were going to die that day."  *Id.* at 97.

{¶20}  Dr. Geiger has been Williams's family physician since October 2017. Geiger depo. at 21-22.  He saw her in May 2019, approximately one month following the dog incident.  *Id.* at 10.  He diagnosed her with post-traumatic stress disorder ("PTSD") from the incident.  *Id.* at 14.  Williams was "struggling with increased anxiety" and depression.  *Id.*  Dr. Geiger opined Williams's PTSD was caused by "her witnessing her dogs being attacked and severely injured or killed, depending on which dog you talk about."  *Id.* at 17.  He agreed her serious emotional distress was significant and debilitating.  *Id.* at 18.  He increased the dose of one of her medications to help with the depression.  T. at 19-20.

{¶21}  Dr. Geiger testified this dog incident was not the first time he had treated Williams for a dog attack, explaining he had treated her on August 24, 2018 for a dog attack in which she was bitten by a stray dog who attacked her dog.  *Id.* at 32.  During the 2018 incident Williams was bitten; in contrast, during the 2019 incident, Williams's dogs were attacked.  *Id.* at 33.  We note that the person who negligently inflicts injury on another must accept the injured party as encountered.  *McDevitt v. Wenger*, 5th Dist. Tuscarawas No. 2002AP090071, 2003-Ohio-6096, ¶ 34-35.  So, this testimony is relevant as to whether Williams suffered severe emotional distress.

{¶22}  While the testimony from Dr. Geiger suffers from a lack of clarity, it does appear that Williams reported to him that she was in fear for her own safety.  When questioned about his office records pertaining to the May 2019 appointment, Dr. Geiger acknowledged there was nothing in the record to indicate "she was fearful for her own

safety, that she had any kind of traumatic reaction for her own safety," but testified "she also did relate some fear to herself, you know, that the dog might turn on her."  Geiger depo. at 34.  Dr. Geiger admitted that was not written in the record.  *Id.*  The following exchange then occurred at 39-40:

> Q. The stressor - - the stressor in your diagnosis of post-traumatic stress disorder was witnessing the death of her dog; correct?
>
> A. Correct.
>
> Q. She didn't report to you anything about fearing for her own safety because that would be in the records and it's not?
>
> * * *
>
> A. I didn't put it in.  It probably should have been.

{¶23}  In addition, Williams presented lay testimony about the impact of the attack on her.  Williams's friend, Tammie Straight, averred she has known Williams for approximately 7-8 years.  Straight aff. at ¶ 3.  Straight stated she has observed Williams "suffering from severe emotional distress as a result of the attack" and the severe emotional distress is "severe and debilitating."  *Id.* at ¶ 9 and 10.  Straight further stated: "Before the attack, I would go on walks regularly with Debbie.  We no longer go on walks.  Debbie is much more emotional, anxious, and fearful following the attack."  *Id.* at ¶ 12.

{¶24}  In response to this testimony, appellees argue a plaintiff cannot suffer emotional distress by watching personal property be destroyed.  And by personal property, appellees refer to Williams's pet dog Amigo that was mauled to death next to

her, citing R.C. 955.03 (dogs are personalty) and *Oberschlake v. Veterinary Associates Animal Hospital,* 151 Ohio App.3d 741, 2003-Ohio-917, 785 N.E.2d 811, ¶ 15 (2d Dist.) ("Ohio does not recognize noneconomic damages for injury to companion animals").  But Williams's negligent infliction of emotional distress is predicated on her own fear of injury during the incident.  The critical fact is that Williams's psychological injuries arising from her exposure to physical danger is distinct damages from the emotional distress she may have suffered watching the attacks on her dogs.

{¶25}  In *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), the Supreme Court of the United States reviewed a negligent infliction of emotional distress claim under the Federal Employers' Liability Act.  A railroad worker witnessed the death of a coworker under harsh working conditions.  The railroad worker was performing the same tasks as the deceased worker.  The court found the railroad worker's claim for negligent infliction of emotional distress could survive summary judgment under the common law "zone of danger" test.  This test "limits recovery for emotional injury to those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct."  *Id.* at 547-548.  The zone of danger test has been acknowledged by the Supreme Court of Ohio in *Paugh v. Hanks,* 6 Ohio St.3d 72, 75-76, 451 N.E.2d 759 (1983), and *Dobran v. Franciscan Medical Center*, 102 Ohio St.3d 54, 2004-Ohio-1883, 806 N.E.2d 537, ¶ 17-18.  *See also Heintzelman v. Air Experts, Inc.,* 5th Dist. Delaware No. 2005-CAPE-08-0054, 2006-Ohio-4832, ¶ 35-38.  However, the test did not apply to the facts in the three cited cases.  We find the zone of danger test applies in the case sub judice.

{¶26} Here, there is no doubt that Williams was "placed in immediate risk of physical harm" because of appellees' conduct. Once Elson opened the door of the residence and set the dog loose, the dog jumped the fence, charged, attacked Pudge, was retrieved by Elson, jumped the fence again, charged again, and then killed Amigo. All the while, Williams was standing in the middle of the melee, holding on to her two leashes and screaming. Thus, the same course of events that resulted in Amigo's death simultaneously put Williams at risk of physical harm. Accordingly, the trial court correctly held that Williams was in the zone of danger. June 14, 2022 Judgment Entry at 6. Indeed, the trial court noted that the record reflected Williams's fear of the attacking dog and "specifically of the possibility that she might be that animal's next target." *Id.*

{¶27} Although the trial court appears to conclude that Williams suffered emotional distress, appellees argue the contrary. We agree with the trial court. "[S]erious emotional distress describes emotional injury which is both severe and debilitating." *Paugh* at 78. As cited above, Williams established that she experienced serious emotional distress following the dog attack. Williams depo. at 90-91, 96-97; Geiger depo. at 14, 18, 19-20, 34, 39-40; Straight aff. at ¶ 9, 10, 12.

{¶28} Appellees characterize this emotional distress as arising solely from witnessing the death of Amigo. But this characterization is both inaccurate and beside the point. In the ordinary case where a pet dog is mauled and killed while under the owner's control, the owner will usually be in reasonable fear of injury too. A defendant may be able to point to facts to rebut that such an owner was also in danger during a dog attack, but appellees were unable to do so here. Thus, this incident is distinguishable from one where the owner of the dog being mauled to death is outside the zone of danger

and not simultaneously in danger of physical harm from the dog attack. Particularly when, as in the case here, Williams had previously been the victim of a dog bite.

{¶29} Despite finding Williams to be in the zone of danger and experiencing PTSD, the trial court found Williams could not prevail because she failed to "demonstrate, via expert testimony, that the harm of which she complains" resulted from appellees' conduct. We hold expert testimony was not required here.

{¶30} The Supreme Court of Ohio has held that lay testimony regarding the emotional distress can be sufficient. *Paugh* at 80 ("lay witnesses who were acquainted with the plaintiff, may testify as to any marked changes in the emotional or habitual makeup that they discern in the plaintiff after the accident has occurred. The jurors themselves, can refer to their own experiences in order to determine whether, and to what extent, the defendant's conduct caused the serious emotion[al] distress"). *See also White v. Bhatt*, 2017-Ohio-9277, 102 N.E.3d 607, ¶ 28 (5th Dist.). Here, the lay testimony broadly supported Williams's claims.

{¶31} The Supreme Court of Oho did leave open the possibility that in some cases, a plaintiff will need expert testimony to demonstrate the "genuineness" of their emotional distress. *Paugh* at 76-77. One such area where courts of appeals have determined that expert testimony is necessary is when the underlying tortuous act sounds in medical negligence. *White, supra* (plaintiffs claimed severe emotional distress by witnessing their mother's negligent medical care); *Powell v. Grant Medical Center,* 148 Ohio St.3d 1, 2002-Ohio-443, 771 N.E.2d 874 (plaintiffs claimed severe emotional distress from hospital's negligent handling of their mother's dead body); *Grote v. J.S.*

*Mayer & Co.,* 59 Ohio App.3d 44, 570 N.E.2d 1146 (1st Dist.1990) (plaintiff claimed emotional distress arising from negligent psychological counseling).

{¶32} These cases are distinguishable in a couple ways. First, the case sub judice is not a case arising from a claim of professional negligence. Second, Williams was directly exposed to physical harm, she was not a mere bystander. In accord with *Paugh* and *White,* there was no absolute requirement here for expert testimony to establish "genuineness." We acknowledge the expert testimony in this case was less than helpful to Williams. But Williams's testimony about her fear of being exposed to physical harm during the dog attack, in conjunction with Dr. Geiger's testimony about her diagnosis and treatment, was sufficient to resist summary judgment on this issue.

{¶33} Upon review, we find the trial court erred in granting summary judgment to appellees.

{¶34} The sole assignment of error is granted.

{¶35} The judgment of the Court of Common Pleas of Licking County, Ohio is hereby reversed, and the matter is remanded to said court for further proceedings.

By King, J.

Baldwin, J. concur and

Hoffman, P.J. concurs separately.

*Hoffman, P.J., concurring*

**{¶36}** I concur in the majority's analysis and disposition of Appellant Williams' sole assignment of error.  I write separately primarily because I would go further and recognize an exception to the general rule barring a negligent infliction of emotional distress claim for witnessing damage to one's own personal property.[1]  I would allow such a claim when the personal property damaged is a living creature as opposed to an inanimate piece of personal property.

---

[1]        I find additional support for the majority's analysis when considering the dispute as to which of the three dogs bit Elson.  Because we are required by Civ.R. 56 to consider the evidence in a light most favorable to the non-moving party (Williams), we must accept Williams' claim she saw Toy's dog bite Elson before it renewed its attack on Williams' second dog.

I also find a third, additional distinction between the case sub judice and the *Paugh* and *White* decisions. The situation giving rise to the two separate causes of Williams' emotional distress: 1) witnessing the brutal attack of her dogs; and 2) fear for her own personal safety, occurred simultaneously, rather than by events separated in time.  Williams' status was both a bystander and an injured party at the same time.